# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 19-CR-162-JED |
| | ) | |
| CARNELL LOVETTE MATTHEWS, | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

The Court has for its consideration the Motion to Suppress (Doc. 19) of Defendant Carnell Matthews, who is charged with enticing a minor and receiving child pornography. (*See* Doc. 23). Both charges stem from messages that Mr. Matthews allegedly exchanged with "MV," a 16-year-old girl, via social media during a five-hour period beginning April 30, 2019, and ending about 12:30 a.m. the next morning. Mr. Matthews seeks to suppress statements he made to Broken Arrow Police Department detectives when they questioned him about the exchange during a July 10 interview at his home. Although Mr. Matthews signed a form waiving his *Miranda* rights prior to questioning, he claims that the waiver and subsequent statements were not given voluntarily, so anything he told to police during the interaction should be barred at trial.

Where the voluntariness of a confession is in question, the defendant is entitled to a hearing in which the underlying factual issues and the voluntariness of his confession are actually and reliably determined. *Jackson v. Denno*, 378 U.S. 368, 380 (1964); *see also* 18 U.S.C. § 3501(a); *United States v. Janoe*, 720 F.2d 1156, 1164 (10th Cir. 1983). Accordingly, the Court held a hearing on October 16, 2019, during which the parties presented evidence related to the facts and circumstances surrounding Mr. Matthews's waiver and subsequent statements to police.

## I. Background and Summary of the Evidence

On May 2, 2019, MV's mother contacted the Broken Arrow Police Department to report that her daughter had received sexually explicit messages from a teacher in the Broken Arrow Public Schools system. Investigators subsequently subpoenaed records of the exchange from Snapchat, the social media platform where the exchange occurred, and scheduled an interview with Mr. Matthews for July 10 at the Broken Arrow police station. When he failed to show for the interview, police obtained a warrant for his arrest, and detectives Ian Buchanan and Mark Carter were deployed to Mr. Matthews's residence in Tulsa to conduct the interview and execute the warrant.

According to Mr. Buchanan's testimony, when he and Mr. Carter arrived, they spoke to Mr. Matthews briefly at the front door and he agreed to speak with them in his home's attached garage, which was empty and open to the driveway. When the conversation turned to sensitive matters, Mr. Buchanan said, the three moved to the driveway so as to be out of earshot of Mr. Matthews's stepchildren, who were inside. The tenor of the conversation was relaxed, according to Mr. Buchanan, and Mr. Matthews never seemed like he was drunk. An audio recording, which the government submitted to the Court but did not play during the hearing, captured the interaction, beginning with the move to the garage. (*See* Doc. 30-2). The recording largely corroborates Mr. Buchanan's version of events.

Mr. Matthews, whose testimony was the only evidence offered in support of his motion, gave a similar account, though it differed in some material respects. He claimed, for example, that on the day of the interview, he had been drinking since 7 a.m. By the time police arrived at about 2:15 p.m., he said, he had consumed a dozen pints of beer and a pint of whiskey. During the

interview, he said, he was so unsteady on his feet that he had to move from the garage to the driveway so he could lean on a parked truck.[1] The audio recording supports Mr. Buchanan's characterization of the interaction as amicable, but Mr. Matthews testified that one of the officers raised his voice during the interview, causing him to feel threatened. Mr. Matthews further testified that he understood the *Miranda* warning that the detectives gave him but did not understand why police were questioning him.

The events captured on the government's audio recording can be summarized as follows: After some brief chitchat, and without telling Mr. Matthews why he was being interviewed, one of the detectives delivered the *Miranda* warning, reading from the Broken Arrow Police Department's standard *Miranda* notice and waiver form, which Mr. Matthews subsequently signed.[2] A detective asked Mr. Matthews if he was under the influence of drugs or alcohol, to which Mr. Matthews responded, "I've been drinking." "Do you feel drunk," one of the detectives

---

[1] In the audio recording, one of the detectives can be heard offering to move the conversation outside, but it is unclear what prompted the move.

[2] The form includes, and the detective read aloud, the required *Miranda* warnings. Mr. Matthews was notified of his right to remain silent; warned that any statements could and would be used against him; told of his right to consult an attorney before and during questioning; and told of his right to a court-appointed attorney if he could not afford one. (*See* Doc. 30-2; Doc. 30-3). Mr. Matthews was also read the following waiver statement:

> I have read the statement of my rights shown above. I understand what my rights are. I am willing to answer questions and make a statement. I do not want a lawyer present at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure of any kind has been used against me.

(Doc. 30-3).

asked. "No," Mr. Matthews answered.[3] Neither Mr. Matthews nor the detectives raised the issue of his intoxication, or lack thereof, again.

After they completed the *Miranda* process, the three proceeded to chat for several minutes about Mr. Matthews's role as a coach and his job with Broken Arrow Public Schools. Eventually, Mr. Matthews asked the detectives why they wanted to talk to him. Rather than immediately informing Mr. Matthews of the arrest warrant or the allegations against him, the detectives slow-played the interview. At first, they simply asked him if he used the social media platform Snapchat and, if so, what his username was. Mr. Matthews acknowledged using the app and said he had done so under two usernames. In April, he said, someone had "jacked" his original account,[4] forcing him to open a new one under a different username. Although he used Snapchat to communicate with students, Mr. Matthews said, he did so only in service of his teaching duties.

Here, the detectives began to put their cards on the table, telling Mr. Matthews that a student had reported exchanging sexually explicit messages with him using the social media platform. Confronted with the allegation, Mr. Matthews admitted to receiving nude photos from MV and said that she and other students had, unsolicited, used Snapchat to send inappropriate messages to him. Asked how he responded when MV sent him the photos on this occasion, Mr. Matthews said, "I told her no. No. We can't. We can't do this." That was untrue, the detectives said. They had a log of the messages from Snapchat. Mr. Matthews then admitted to participating willingly in the exchange and to sending photos of his genitals to MV. He had been drinking that night, he said. When he had sobered up, he deleted the Snapchat account. The real reason he had

---

[3] Mr. Buchanan testified that he was trained to recognize behavior indicating intoxication and had significant experience dealing with drunk individuals from his years working as a patrolman. Mr. Matthews showed no signs of being drunk, according to Buchanan.

[4] I.e., someone else had hacked his account, taking control of it without his consent.

abandoned the account was that he knew he should not have participated in the exchange, he said, not the mysterious hack he had mentioned earlier.

Shortly thereafter, the detectives told Mr. Matthews that they had a warrant for his arrest. His reaction was muted: "Ok," he said quietly. As the detectives put him in handcuffs, he said, "I can't believe this is happening." After he had been placed in custody, Mr. Matthews asked whether he could tell his stepchildren what was happening, inquired as to what the booking process would entail, and helped the officers to unlock his phone and find his wife's telephone number so they could tell her of his arrest. During the drive to the jail, Mr. Matthews engaged in further small talk with the officers and assured them that, when they searched his phone, they would find no images or exchanges with other students.

## II.  Legal Standards

Mr. Matthews argues that his statements to police should be suppressed for two reasons. First, he argues that his *Miranda* waiver was invalid because he was drunk when he signed it and, at the time he did so, he did not know what they intended to ask him. Second, Mr. Matthews argues that police violated his due process rights by extracting an involuntary confession.

In order for a confession to be admissible under the Fifth Amendment, law enforcement officers must inform the defendant of his *Miranda* rights and the defendant must knowingly, intentionally, and voluntarily waive those rights. *United States v. Smith*, 606 F.3d 1270, 1276 (10th Cir. 2010). A waiver is valid when it is "the product of a free and deliberate choice rather than intimidation, coercion, or deception" and made with a full awareness of the nature of the rights being abandoned and the consequences of abandoning them. *Id.* The mere fact that a person has used drugs or alcohol will not overcome a showing that the defendant "was sufficiently in touch

with reality so that he knew his rights and the consequences of abandoning them." *United States v. Augustine,* 742 F.3d 1258, 1265 (10th Cir. 2014).

Even if law enforcement officers have properly advised a defendant of his *Miranda* rights and obtained a valid waiver, due process may nevertheless prohibit the admission of the defendant's inculpatory statements if they were not made voluntarily. *United States v. Varela*, 576 F. App'x 771, 775 (10th Cir. 2014). Ultimately, the validity of a *Miranda* waiver and the voluntariness of a suspect's statements turn on the same question: whether, given the totality of the circumstances, the suspect's will was "overborne." *Smith*, 606 F.3d at 1276–77. The burden is on the government to prove that a confession was made voluntarily. *United States v. Muniz*, 1 F.3d 1018, 1021 (10th Cir. 1993).

## III. Findings of Fact and Conclusions of Law

The Court finds that Mr. Matthews voluntarily waived his *Miranda* rights. The foundational claim for his argument to the contrary—that he was highly intoxicated when he signed the waiver—is unworthy of credence. Although he testified that he had ingested twelve pints of beer and a pint of whiskey prior to the interview, his behavior, as captured on the recording, bore none of the hallmark signs of drunkenness. His speech was clear and un-slurred. He spoke at a normal volume. He listened without interrupting. His responses were coherent and on topic. In short, his demeanor was consistent with his statement to police that he did not "feel drunk."

Furthermore, Mr. Matthews was clearly capable of weighing the consequences of his actions, a fact borne out by the piecemeal manner in which he admitted to the alleged misconduct. Mr. Matthews initially claimed that he only used the app for valid work purposes. When the officers told him that MV had given them details about the conversation, he admitted to receiving pictures from her but insisted that she had sent them unsolicited and that he had told her to stop.

6

When the detectives told him that they knew this to be untrue because they had a copy of the text messages, Mr. Matthews again changed tack, conceding that he had been a willing participant in the exchange but assuring the detectives that he had renounced further contact with the girl. At each stage of the interview, Mr. Matthews's admissions came only after the detectives had revealed how much they already knew. This demonstrates both an awareness of the danger that he was in and an effort to mitigate his potential liability. It is not the behavior of a drunk who accidentally spills the beans.

Finally, and most significantly, Mr. Matthews himself testified that he was not so drunk that he did not understand the *Miranda* warnings he received. It is immaterial that, at the time Mr. Matthews chose to waive his *Miranda* rights, he claims not to have known why the detectives wanted to interview him. He has cited no authority to support the proposition that a defendant must know the details of the allegations against him before he can validly waive his *Miranda* rights. Moreover, Mr. Matthews appears to have understood the purpose of the interview from the beginning. Before the detectives ever broached the subject of his alleged Snapchat exchange, Mr. Matthews fabricated the tale of his account being hacked. Such a preemptive excuse only makes sense if he already knew the nature of the questions the detectives intended to ask him.

With respect to Mr. Matthews's due process argument, he has provided no evidence that his will was overborne by the circumstances of his interrogation. He was interviewed in a familiar environment. The conversation lasted less than a half hour. And the tenor of the conversation was, at all times captured by the recording, amicable. Moreover, the claim that he was drunk during the interview lacks even the feeblest of evidentiary support. Mr. Matthews has offered no evidence to corroborate his testimony regarding the staggering quantity of alcohol he supposedly consumed in the hours leading up to the interview. If he did drink as much as he claims, the audio recording

shows that it had no effect on his ability to reason or speak coherently. Having considered the totality of the circumstances, the Court finds that his statements to police were made voluntarily.

**III.     Conclusion**

For the reasons explained above, the Court finds that Mr. Matthews knowingly, intelligently, and voluntarily waived his *Miranda* rights. The Court further finds that his subsequent statements to police were made voluntarily, in accordance with the requirements of due process. Mr. Matthews's Motion to Suppress is therefore **denied.**

**SO ORDERED** this 21st day of October, 2019.

JOHN E. DOWDELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT